**Ricardo BELL, et al.,
Plaintiffs, Appellants,**

v.

**STREETWISE RECORDS, LTD., et al.,
Defendants, Appellees.**

**Ricardo BELL, et al.,
Plaintiffs, Appellees,**

v.

**STREETWISE RECORDS, LTD.,
Defendant, Appellant.**

**Ricardo BELL, et al.,
Plaintiffs, Appellees,**

v.

**STREETWISE RECORDS, LTD.,
Defendant, Appellee.**

**Boston International Music, Inc., etc.,
Defendant, Appellant.**

**Nos. 84–1415 to 84–1416.**

United States Court of Appeals,
First Circuit.

Heard Nov. 7, 1984.

Decided May 8, 1985.

As Amended May 9, 1985.

**68**

Dean Richlin, Boston, Mass., with whom Craig R. Browne and Budd, Wiley & Richlin, Boston, Mass., were on brief for Ricardo Bell.

A. Van C. Lanckton, Boston, Mass., with whom Thomas S. Francis and Craig & Maccauley, P.C., Boston, Mass., were on brief for Boston International Music, Inc.

Michael Arthur Walsh, Boston, Mass., with whom Mark A. Michelson and Choate, Hall & Stewart, Boston, Mass., were on brief for Streetwise Records, Ltd.

Before COFFIN and BREYER, Circuit Judges, and WYZANSKI,* Senior District Judge.

WYZANSKI, Senior District Judge.

These are appeals from denials of motions for preliminary injunctions in a case alleged to be within the district court's jurisdiction under 28 U.S.C. § 1338(a) and jurisdiction pendent thereto.

The plaintiffs—Ricardo Bell, Michael Bivins, Robert Brown, Ronald DeVoe, and Ralph Tresvant—are black males not of full age, each of whom is a citizen of Massachusetts, each of whom brings suit by his "best friend" William E. Dern of New York, and all of whom constitute the song-and-dance group which calls itself NEW EDITION. The defendants and counterclaimants are StreetWise Records, Ltd. (StreetWise), a New York corporation, which produces and markets phonorecords, and Boston International Music, Inc. (BIM Inc.), a Massachusetts corporation, of which the president is Larry Johnson, also known as Maurice Starr, who is by profession a singer, musician, producer, songwriter, recording artist, and arranger.

This controversy involves the use in the national phonorecord market—not in *viva voce* performances—of the two words NEW EDITION as an *unregistered* trademark. The plaintiffs and the defendants, alike, seek preliminary and permanent injunctions to prevent their adversaries from using that mark on phonorecords. However, the plaintiffs do not seek any injunc-

Breyer and Coffin, Circuit Judges, concurred and filed an opinion.

* Of the District of Massachusetts, sitting by designation.

tion restraining use of records in which they sing. Each side presents a claim allegedly based on § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The plaintiffs present also a second claim arising under § 12 of the Massachusetts anti-dilution law, Mass.Gen.L. c. 110B, § 12, and a third claim alleged to be "based upon principles of pendent jurisdiction" and seeming to arise under the Massachusetts non-statutory law of unfair competition.

In the district court the plaintiffs and the defendants, on the basis of only affidavits and written exhibits, moved, respectively, for preliminary injunctions. The magistrate made findings of fact and recommended that the district judge should issue a preliminary injunction restraining the defendants from using the trademark NEW EDITION in connection with musical entertainers other than the plaintiffs, and further recommended that the district judge should not issue the preliminary injunction sought by the defendant-counterclaimants. The district judge adopted the magistrate's findings of fact but denied all preliminary injunctive relief on the ground that although the plaintiffs jointly were the exclusive owners of the trademark NEW EDITION, they, by disaffirming their employment contracts, had unclean hands which precluded them from being awarded equitable relief.

The affidavits and exhibits tell this story.

In 1980 in the Roxbury section of Boston five adolescent black males—whom correctly their counsel, using legal terminology, calls "infants"—appeared as a group under the name NEW EDITION (or, as the plaintiff Brown testified, THE NEW EDITION) first at Roscoe's Lounge and subsequently in other places of entertainment to give a song-and-dance act. Some of the original five members of the group dropped out, but the remainder together with substitutes for the drop-outs continued in 1980, 1981 and 1982 jointly to give song-and-dance performances at lounges, clubs, and schools in and around Boston.

The group gave in the three years 1980–82 roughly a dozen performances, for which they were often but not invariably paid, under the name NEW EDITION or THE NEW EDITION. Audience association of that name with the plaintiffs was testified to by only one member of the public, Roscoe Gorham, the manager of Roscoe's Lounge. On the other hand, Starr (without denying that in the local Boston live entertainment market the words NEW EDITION were associated in the minds of the local audience with the plaintiffs) testified that the plaintiffs "had absolutely no reputation in the music business. They had never made a commercial musical recording ...".

During the period from the 1970's through 1981 Starr had conceived what he called a "Concept" of writing music in a style to which he referred as "80's black bubblegum" music, and which he describes as a "style and type of music ... produced by combining elements of the type of music performed and recorded by the 'Jackson 5' in the decade of the 1960's with elements of current musical trends and techniques, such as 'rap' music and the use of synthesizer instrumentation." Using that concept, he in conjunction with his brother wrote a song they called "Candy Girl".

In 1981 Starr employed the plaintiff Tresvant to sing "Candy Girl" with himself and his brother on a demonstration record, in which the instrumental music was played by Starr and his brother. To produce this demonstration record cost Starr over $5000.

In the same year, 1981, Starr had become acquainted with plaintiffs Brown, Bell, and Bivins. In the fall of that year the plaintiff Tresvant and later the plaintiff DeVoe jointly appeared with Brown, Bell, and Bivins under the name NEW EDITION, in live shows produced by Starr.

At about the same time Starr and Streetwise decided to have a group of young black males sing "Candy Girl" and such other songs as Starr might compose in his "80's black bubblegum" music style. Starr had a plan to use black youths as a "suitable marketing tool", that is, they were "to serve as the marketing vehicle for the mu-

sical recordings" which would embody what Starr denominates "the Concept" of "80's black bubblegum" music.

On October 8, 1982 Starr, apparently as a partner in a partnership known as Boston International Records (BIR), entered into a contract—not offered in evidence—with StreetWise, providing for the former to compose "80's black bubblegum" music and the latter to produce and nationally market phonorecords of that music. Starr testified, without contradiction, that—presumably pursuant to a specific provision of the foregoing unexhibited contract—"By express agreement, StreetWise and BIR jointly hold the exclusive rights to the use of the "New Edition" mark in the musical recording industry." While the judicial record does not specifically so show, the parties and the district court have assumed and we shall also assume that BIR's and Starr's rights and obligations under that contract with StreetWise were, by a novation, respectively assigned to and undertaken by BIM Inc. when it was organized by Starr and his partners in 1983.

As contemplated by Starr and StreetWise in the October 8, 1982 contract, StreetWise in November and December 1982 entered into separate contracts to employ each of the plaintiffs. In making those contracts the plaintiffs were represented by counsel. Those employment contracts—with one exception about to be mentioned—parallel one another. Each in similar language defines the term of the contract, provides that the particular plaintiff covered by the contract shall be called "Artist", specifies his royalties, prohibits the Artist from making master recordings for others than StreetWise during the term of the contract and for some years afterward, and grants to StreetWise the right to couple performances rendered by Artist with performances rendered by others.

The contracts have in paragraph 9 this provision:

Artist hereby grants to Company the sole and exclusive right to use and permit others to use Artist's name (including any professional names now or here-after adopted by Artist), likeness, biographical material and facsimile signature for advertising and trade purposes in connection with the manufacture, distribution, sale and exploitation (individually and as a member of the group) of phonograph records embodying Artist's performances recorded hereunder, and in advertising Company, its artists and products.

Except in Tresvant's case, each of the employment contracts also specifically notes in paragraph 1.d.:

Artist performs in a musical group named *The New Edition* and confirms that the name is wholly owned by Boston International Records Inc. [sic], and that Artist has no right or interest in and to the name.

No such provision is included in Tresvant's employment contract.

Thereafter StreetWise, at an expense of over $330,000 of its own funds, produced and marketed nationally "Candy Girl" and like records. Over a million records were thus sold throughout this country. The judicial record before us does not show whether in accordance with their employment contracts the plaintiffs have ever received and are currently receiving from StreetWise royalties on the records.

To promote the sales of records and undoubtedly also to make profits for themselves directly through tickets sold for admission to their live appearances, the plaintiffs sang and danced under the name NEW EDITION, beginning in 1983, in many places in the United States.

There are affidavits from several persons to the effect that (after the defendants had marketed their phonorecords and the plaintiffs had sung *viva voce* in live performances throughout the country) the general music public associated the name NEW EDITION with the plaintiffs as a group, and not with Starr's concept of musical composition.

Under date of November 15, 1983 Fletcher H. Wiley, Esq. a member of the law firm known as Budd & Wiley, acting as the legal

representative of the five plaintiffs wrote to StreetWise that the firm's clients, the five plaintiffs, "have requested that we advise you that by reason of their infancy, they hereby disaffirm each and every contract between you and them for their services." Robert C. Alexander, chairman of StreetWise, acknowledged that he received that letter signed by Wiley.

On December 22, 1983 the plaintiffs filed in this action their complaint which sets forth claims under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the Massachusetts anti-dilution statute, (Mass.Gen.L. c. 110B § 12) and the Massachusetts non-statutory law of unfair competition. Only Street-Wise was originally named as defendant, but later BIM Inc. was joined as a defendant. Each defendant answered and also filed a counterclaim setting forth a claim under § 43(a) of the Lanham Act.

As we have already recited, the magistrate recommended that the district judge should grant plaintiffs' prayer for a preliminary injunction and should deny the counterclaimants' prayers for a preliminary injunction. The district judge followed the magistrate's recommendation to deny the counterclaimants' prayers, but, contrary to the magistrate's recommendation, denied, on the ground of unclean hands, the plaintiffs' prayers. These appeals followed. I would affirm, although on different grounds, the district court's denial of the plaintiffs' prayers for a preliminary injunction; but I would reverse the district court's denial of the defendants' prayers for a preliminary injunction.

We now analyze the facts in the light of what we regard as controlling legal principles.

The first questions relate to the interests of the plaintiffs before they were employed by StreetWise in November 1982.

At the outset of their professional career the five plaintiffs were a song-and-dance group which performed solely in Greater Boston. We need not pause to consider whether any significance is to be attributed to the fluctuations in the membership of that group, or to the confusion respecting the precise name under which the plaintiffs performed, or even to the plaintiffs' failure to offer any evidence—other than the skimpy affidavit of Roscoe Gorham—as to the association, in the mind of any member of the public, of the words NEW EDITION with any source whatsoever, much less with the plaintiffs. For our purposes it suffices to note that indisputably the trade name, if such it was, had no secondary meaning outside of Boston lounges, clubs, and schools. There is no evidence that the trade name was known to a larger music world; on the contrary Starr swore, without contradiction, that it was not so known. Thus the plaintiffs have failed to prove that their trade name had any secondary meaning in the phonorecord world either locally or nationally. We need not consider what would have been the effect of testimony that, like some other adolescents, the plaintiffs had dreamed of becoming nationally known and featured on phonorecords and that experience of other youngsters in the music world gave those dreams substance. The judicial record in this case contains no such evidence, and we are not free without testimonial support to speculate about the possibility of the plaintiffs' entry into markets which they are not shown to have considered before November 1982, much less to have entered.

Taking the record as we find it, we apply Massachusetts law to decide whether the plaintiffs as a result of their dozen or so Boston performances had a trade name which entitled them to some protection, and if so whether the defendants unfairly competed against the plaintiffs.

Inasmuch as before November 1982 so far as the record shows all the conduct of the plaintiffs occurred in Massachusetts, all their plans related to activities by them or others in Massachusetts, and all the persons who knew of them were in Massachusetts, and no extrastate dealings by them or any competitors were involved, it is plain that the law of the Commonwealth of Massachusetts governs the situation as of November 1982. As of that date the Lanham Act had no applicability. See *De-*

*Costa v. Columbia Broadcasting System, Inc.,* 520 F.2d 499, 513 col. 1 lines 3–5 (1st Cir.1975).

We shall assume that under Massachusetts law the plaintiffs as of November 1982 were entitled to protection against the use by others of the words NEW EDITION in connection with song-and-dance performances in Greater Boston. But Massachusetts authorities, in line with authorities elsewhere, make clear that the plaintiffs as of the date they entered into the employment contracts with StreetWise had no right to preclude the defendants or anyone else from using NEW EDITION in the national phonorecord market—because they had no reputation or interest in that market. *Skil Corporation v. Barnet,* 337 Mass. 485, 488, 493 first full paragraph, 494 first full paragraph, 150 N.E.2d 551 (1958); *265 Tremont Street, Inc. v. Hamilburg,* 321 Mass. 353, 356–358, 73 N.E.2d 828 (1947); *Pignons S.A. de Mecanique v. Polaroid Corp.,* 657 F.2d 482 (1st Cir.1981); *Raxton Corp. v. Anania Assoc., Inc.,* 635 F.2d 924, 929 (1st Cir.1980) appeal after remand 668 F.2d 622 (1st Cir.1982); *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1130, 1131, 1137 (2d Cir.1979); *Hyde Park Clothes v. Hyde Park Fashions,* 204 F.2d 223, 228–229 (2nd Cir.1953) cert. den. 346 U.S. 827, 74 S.Ct. 46, 98 L.Ed. 351 (1953); *Dwinell-Wright Co. v. National Food Product Co.* 140 F.2d 618, 622–623 (1st Cir.1944); Restatement, Torts § 717 (1)(b)(ii), § 730, § 730 comment b, § 733.

We now examine the rights of the parties immediately after the execution in November and December 1982 of the five plaintiff's separate employment contracts with StreetWise.

When the plaintiffs, assisted by counsel, executed those contracts they did not suppose that *with respect to the phonorecord market* they had any trade name to contribute. Four of the plaintiffs specifically recognized that this was the case; they acknowledged that the name "NEW EDITION" "is wholly owned by Boston International Records, Inc." [sic]. Insofar as that admission referred to the phonorecord market that was a precisely correct statement for as of November 1982 only Starr and StreetWise had ever thought of using those two words as a symbol in the phonorecord market—and in that market no plaintiff had any claim. We need not pursue the point by observing that the situation is not different with respect to plaintiff Brown even though he testified that he never intended to be bound by the admission that he had no claim in the phonorecord market. Nor is the situation different with respect to plaintiff Tresvant although he never signed an admission against interest. Regardless of what Brown and Tresvant did or did not admit, there is no evidence that they had before November 1982 any claims staked out *in the phonorecord market* which they could have contributed to the development of the StreetWise—BIR trademark.

All that the five plaintiffs had to offer were their services as singers. Starr (first through his partnership BIR and later through his corporation BIM Inc.) and StreetWise were the organizers of the enterprise who jointly had the idea of using as a symbol in the phonorecord field the two words NEW EDITION into which they were planning to put legal life as a trademark by affixing the words to records and getting the public in the phonorecord world to associate those words with the source of the phonorecords. In this undertaking, of course, STREETWISE, being a corporation, had to use as agents human beings. Therefore it offered separate contracts of employment to the plaintiffs.

Those contracts explicitly contemplated the right of StreetWise to couple each individual plaintiff with whichever fellow "Artists" StreetWise should select. As a matter of fact, from the physical phonorecords which are in the judicial record we know that StreetWise did not always, if ever, use only the five plaintiffs. In "Candy Girl", for example, the principal vocal parts were sung by plaintiff Tresvant, Starr, and his brother Jonzun, incidental background vocal parts were sung by plaintiffs Bell, Bivins, Brown and DeVoe, and musical in-

struments were played by Starr and one other person.

On their face those employment contracts refute any contention that the plaintiffs were partners of the defendants, or were employed as a partnership, or were joint venturers with the defendants, or were employed as a team of joint venturers.

Furthermore, paragraph 9 of each of those employment contracts granted to StreetWise the exclusive right to use and permit others to use the "Artist's" professional name. This is in line with what is recited in Shemel and Krasilovsky, *Revised and Enlarged New Copyright Act Edition, This Business of Music,* published by Billboard Publications, Inc. N.Y.1977 at p. 309:

> So that the record company can protect its investment in recordings and promotion, the typical artist's contract with a record company specifies that the record company has exclusive rights to use the artist's name in connection with the recordings made thereunder. Sometimes, the right to the artist's name is limited to use in connection with the recordings of the particular artist. More often, the record company will obtain the right to exploit the name for its own institutional advertising purposes, even without reference to specific recordings of the artist.

Each of the employment contracts implies that each party will in good faith seek to maximize the sales of the records so that the royalties earned will be as high as is economically possible. On the part of the plaintiffs as well as the defendants, the contract is "instinct" with that obligation. See *Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917) (per Cardozo, J.)

In line with that instinctive obligation, and to promote the sale of the phonorecords bearing the mark NEW EDITION, as well as to earn for themselves personally a substantial share of the admission receipts paid by spectators who heard them *viva voce,* the plaintiffs sang as a group throughout the United States. This swelling of the reputation of the trademark and this enhanced public recognition, of course, made the trademark legally and economically stronger. This was all foreseen and indeed intended. But it did not change the form of the plaintiffs' rights. They in the phonorecord market were still not owners of the mark but were employees to be compensated solely by royalties—which, no doubt, swelled as their own reputation and the public recognition of the mark swelled. To repeat, in the phonorecord market the plaintiffs were only employees, not partners, nor joint-venturers. As employees they did not have a legal title to, or ownership of, the trademark in the phonorecord market. In the live entertainment market the situation was different.

We do not mean to indicate that the plaintiffs were at the mercy of the defendants' zeal or lack of it in exploiting the trademark, or were at risk of losing all their royalties if StreetWise should become insolvent. Without purporting to decide issues which are not now before us—but saying only what we must to guide the district court in framing injunctive relief— we are of the opinion that Massachusetts law would recognize that as a consequence of the November and December 1982 employment contracts, there exists a quasi-fiduciary relationship between the plaintiffs and StreetWise even though it fell short of a partnership or a joint venture. Cf. *Shinberg v. Garfinkle,* 361 Mass. 109, 115, 278 N.E.2d 738 (1972). That relationship required that, especially because of what the plaintiffs had done by public *viva voce* appearances to enhance the value of the trademark, StreetWise exploit to the economic maximum their talents as a group of singers on the phonorecords of "Candy Girl" and other songs composed by Starr. We are of the opinion that the employment contracts were "instinct" with that obligation.

Moreover, if StreetWise should become insolvent or should dispose of the trademark to one who did not pay full value or who knew of the plaintiffs' employment contracts we are of the opinion that the

successor in legal title to the trademark would be under an equitable obligation to pay the plaintiffs royalties at the agreed upon rate. *In re Waterson, Berlin & Snyder Co.*, 48 F.2d 704 (2d Cir.1931); *Clairol, Inc. v. Cody's Cosmetics, Inc.* 353 Mass. 385, 393 note 9, 231 N.E.2d 912 (1967).

More doubtful would be the rights of the plaintiffs if the defendants sought to use the trademark NEW EDITION for the production and distribution of records in which the group of plaintiffs were not among the singers. We can see force in an argument that the plaintiffs did not protect themselves by including any rights for themselves in such a situation; each plaintiff was content to paddle his own canoe, to sign his own contract of employment, and to leave it up to StreetWise whether to employ him and with whom, if anyone, to team him up as a group singer. But we can also see force in the argument that StreetWise used the plaintiffs as a group to put life into the trademark and to make it a very valuable property, and it is therefore unfair to limit each plaintiff to sharing in the fruits of the trademark in the form of royalties only from such NEW EDITION trademark phonorecords as result from singing by him. We see no need to resolve this difficult matter at this stage; quite possibly StreetWise will never use the trademark except in connection with the voices of these five plaintiffs as a group, and it is even possible that in light of this judicial opinion the plaintiffs and the defendants will resume in full the relationship they had before the purported 1983 disaffirmance of their contracts by the plaintiffs—a matter to which we now turn.

This brings us to the effect, if any, of the November 15, 1983 letter from Fletcher H. Wiley, Esq. of Budd & Wiley, to Street-Wise. That letter states that the plaintiffs disaffirm "each and every contract between you [StreetWise] and them for their services." Technically, no such contract exists: There were five contracts each one between a different one of the plaintiffs and StreetWise; but no contracts between the group of plaintiffs and StreetWise existed. But we treat that technicality as immaterial.

It surely was not the intent of the draftsman of the letter to relieve StreetWise from its obligation to pay royalties due or to become due on the outstanding phonorecords bearing the trademark NEW EDITION, or to impose upon StreetWise a prohibition against further production and sales of phonorecords based on already completed studio recordings of the plaintiffs.

Presumably the draftsman of the disaffirmance letter had two objects: first, to relieve each of the plaintiffs of his obligation, under paragraph 1.b. of his employment contract, which precluded him from making phonorecords for others than StreetWise during the term of the contract and for a period thereafter; and second, to get for the five plaintiffs as a group the legal title to the trademark NEW EDITION as a symbol in the national phonorecord market. On the first object we need not comment. The second object could not be accomplished by a letter or act of disaffirmance by or on behalf of a minor. The minor plaintiffs did not individually or collectively at any time have legal title to the NEW EDITION trademark for services or goods in the national phonorecord market; the letter could not *ipso facto* transfer to the plaintiffs that mark as used in that market; and even if the plaintiffs were allowed to avoid their promise as to abandoning any claim to the mark in that market, there was no basis on which they could claim a right to that mark in that market— for, as we have repeatedly declared, the plaintiffs up to November 1982 had not entered, planned to enter, or been in any way connected with that market, and the plaintiffs after November 1982 had in all their relations to the phonorecord market been StreetWise's agents.

It is hardly necessary for us to remark that the plaintiffs and their counsel have been trying simultaneously to ride two horses going in opposite directions. The plaintiffs want StreetWise to have the trademark for NEW EDITION in the pho-

norecord market so that it can produce and market phonorecords based on master recordings of the plaintiffs, and thus continue to pay royalties to the plaintiffs. At the same time the plaintiffs want to receive as a group the trademark for NEW EDITION in the phonorecord market without reimbursing StreetWise for its over $330,000 expenditure and Starr for his over $5,000 expenditure. Manifestly no sensible court would enter judgment based on that transparently unsound proposal.

We reach the conclusion that the so-called disaffirmance was nothing but an ill-designed signal that the plaintiffs wanted the privilege of using in the phonorecord market in connection with new master records the trademark NEW EDITION for their own benefit to the exclusion of STREETWISE and presumably of Starr, BIR, and BIM, Inc.

That was not a privilege available to them as they have no right to the legal title to the mark in that market; at best the plaintiffs jointly have (1) an equitable servitude dominant on that mark in that market and (2) a right (in some as yet undetermined way) to have that mark in that market exploited for their advantage by STREETWISE.

To sum up the matter, the plaintiffs have nothing but a local trade name in the field of musical live entertainment in Massachusetts and a national trade name in the field of musical live entertainment; in the phonorecord market they have no right (either as a consequence of their trade name or of their employment contracts with Street-Wise, or of the independent singing they did after they signed those contracts). Inasmuch as the plaintiffs have not any substantive right under the Lanham Act, the cause of action they presented was not within the jurisdiction conferred upon the district court by 28 U.S.C. § 1338(a). Hence there was no jurisdictional peg on which to hang the pendent jurisdiction claims. Therefore, the district court could properly have dismissed this complaint at the preliminary injunction stage. We need not consider whether we might now dismiss the case for want of jurisdiction. For the time being it is enough for us not to disturb the district court's order denying the plaintiff's motion for a preliminary injunction.

As to the counterclaims, my conclusion is that because the defendants are joint owners of the legal title to the trademark NEW EDITION as used in the phonorecord market, they are entitled to a preliminary injunction against the plaintiffs using directly or indirectly the trademark NEW EDITION in the production and marketing of phonorecords; but the district court in framing the injunction should make it subject to the conditions that (1) StreetWise (a) continue reasonably to exploit the phonorecords in which the plaintiffs appear as singers (see *Wood v. Lucy, Lady Duff-Gordon, supra,*) and (b) pay all royalties now or hereafter due under the employment contracts, and (2) the counterclaiming defendants not interfere with the plaintiffs' rights to give *viva voce* or live performances without any obligation to account to the counterclaiming defendants for any portion of the proceeds of such performances.

In light of the concurring opinion that would give the parties an opportunity for reargument in the district court, *the order of the district court is vacated and the cases are remanded with instructions to proceed in accordance with this, and the concurring, opinions.*

BREYER and COFFIN, Circuit Judges, concurring.

We agree that Judge Wyzanski's opinion correctly states the law governing this case as he views the record. And, we join that opinion with one exception concerning the course of action to be followed on remand: The district court, before issuing an injunction, should allow the parties an opportunity to present further evidence and argument in light of our opinions today.

To explain why we reach this conclusion, we specify two mistakes that we believe the district court made. First, the court entered a decree that, in effect, left both plaintiffs and defendants free to use the

trade name. Even if this result were fair as between the parties, it is not fair in respect to the public. It creates the very 'source' confusion that legal trademark, and tradename, doctrine developed to avoid. When arguing parties are, in a sense, both responsible for the success of a name, a court may find it difficult to decide which, in fact, 'owns' the name; the temptation may be great to say "both own it" or try to 'divide' the name among them. The public interest, however, normally requires an exclusive award. *See* 1 J. McCarthy, *Trademarks and Unfair Competition* § 16:14 at 752–54 (1984). In short, we do not view the "unclean hands" doctrine as sufficient, on the facts of this case, to justify continuation of public confusion.

Second, both district court and magistrate jumped without explanation from their finding that the public *associated* the name NEW EDITION with the plaintiffs to the conclusion that the name *belonged* to the plaintiffs. This conclusion does not necessarily follow. After all, firms frequently develop 'fictional names' and hire employees to play the named role. The firm's express purpose may be to have the public associate the fictional name with the live employee; but that association does not automatically give the employee the right to the name. Presumably, for example, CBS, not Richard Boone, owns the name "Paladin." *Cf. De Costa v. Columbia Broadcasting System, Inc.*, 520 F.2d 499 (1st Cir.1975). In the absence of a specific contract, to decide who owns the name may require a court to examine all relevant circumstances, including the history of the parties' relation to each other and their likely understandings, *see* 1 J. McCarthy, *Trademarks and Unfair Competition*, § 16:14 at 755 (1984), in order to reach an equitable decision.

These points, implicit in the panel's full opinion, suggest to us that both magistrate and district court viewed this case through a very different legal lens than do we. That fact together with the difficult nature of the legal task—creating an 'equitable relationship' (involving both control of the name and perhaps offsetting compensatory monetary payments)—means that the parties should have further opportunity to present evidence and argument before the district court reaches a decision. It may well be, for example, as Judge Wyzanski writes, that the record clearly shows the plaintiffs were StreetWise employees and could not have been anything more. Yet, the plaintiffs were not total strangers to the name NEW EDITION. Suppose there were evidence that they had hired StreetWise as a kind of agent, to promote and to sell both them and their name in the very different nationwide record market? We do not say there is any such evidence. We believe only that, given the change in legal theory that we enunciate, the parties in fairness ought to have an opportunity to make their case again before an injunction issues.