Ricardo **BELL**, Michael Bivins, Robert Brown, Ronald DeVoe, Ralph Tresvant and MCA Records, Inc., Plaintiffs,

v.

**STREETWISE RECORDS, LTD.** and Boston International Music, Inc., d/b/a Boston International Records, Defendants,

v.

**ARISTA RECORDS, INC.,**
Intervenor-Plaintiff,

v.

Ricardo **BELL**, Michael Bivins, Robert Brown, Ronald DeVoe, Ralph Tresvant, MCA Records, Inc. and Jump and Shoot Productions, Inc., Defendants in Counterclaim.

**Civ. A. No. 83–4086–Z.**

United States District Court,
D. Massachusetts.

June 11, 1986.

Dean Richlin, Craig R. Browne, Budd & Wiley, Boston, Mass., for plaintiffs.

Paul F. Ware, Henry C. Dinger, Goodwin, Proctor & Hoar, Boston, Mass., for MCA Records.

Mark A. Michelson, Michael Walsh, Choate, Hall & Stewart, Boston, Mass., Stuart L. Levy, Parcher & Herbert, New York City, for defendants.

A. Van C. Lanckton, Thomas S. Francis, Craig & Macauley Professional Corp., Mark C. Weiner, Boston, Mass., for Boston Intern.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

Plaintiffs Bell, Bivins, Brown, DeVoe and Tresvant, members of a singing group, are known to teenagers across the nation and around the world by the name "New Edition." Together with their present recording company, MCA Records, Inc. ("MCA"), they seek to establish their exclusive right to appear, perform and record under that mark. Defendants and counterclaimants (hereinafter "defendants"), Boston International Music, Inc. ("BIM"), and Streetwise Records, Ltd. ("Streetwise") produced, recorded and marketed the first New Edition long-playing album, "Candy Girl," as well as the singles from that album. Defendants claim that they employed the five individual plaintiffs to serve as a public front for a "concept" which they developed, and to promote musical recordings embodying that "concept." Because the mark New Edition allegedly identifies those recordings, and not the group members, defendants assert that they are its rightful owners. Each side has asked that this court enjoin the other from using the mark.[1]

The amended complaint charges defendants with violations of § 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a) (West 1982), of the Massachusetts antidilution statute, Mass. Gen. Laws ch. 110B, § 12 (West Supp.1986), of the Massachusetts nonstatutory law of unfair competition, and of Mass. Gen. Laws ch. 93A, § 11 (West 1984), which prohibits unfair or deceptive acts or practices. Defendants' counterclaims mirror the claims of plaintiffs.[2]

This court first addressed the parties' cross-motions for preliminary injunctive relief in December 1983. Both motions were denied: defendants', because they had failed to make the requisite showing for preliminary relief, and plaintiffs', because their 1983 disaffirmance of their recording contracts with defendant Streetwise barred them from seeking the aid of a court of equity. The Court of Appeals for the First

---

1. MCA was permitted to intervene as a plaintiff in June of 1985. Its rights to the disputed mark arise by virtue of its contractual arrangements with Messrs. Bell, Bivins, Brown, DeVoe and Tresvant. (The term "plaintiffs" will be used throughout this memorandum to identify the five individual plaintiffs.)

Defendants and plaintiffs-in-counterclaim are BIM, the production company for the "Candy Girl" album, Streetwise, the recording company that released the album, and Arista Records Inc. ("Arista"), another recording company that has purchased a part-interest in the mark. Arista was permitted to intervene as a plaintiff-in-counterclaim in July of 1985. (BIM, Streetwise and Arista will be referred to collectively as "defendants" in this memorandum.) Their alleged rights to the mark derive from Larry Johnson a/k/a Maurice Starr, the president and owner of BIM, and apparently from the promotional efforts of Streetwise as well.

2. Plaintiffs have included an additional count charging unlawful use of name in violation of Mass.Gen. Laws ch. 110, § 4 (West 1958).

Circuit vacated this court's decision. Noting that it did "not view the 'unclean hands' doctrine as sufficient to justify continuation of public confusion," *Bell v. Streetwise Records, Ltd.*, 761 F.2d 67, 76 (1st Cir.1985) (Breyer and Coffin, JJ., concurring), and that both parties should be given the opportunity to amplify the record, it remanded the case for an exclusive award of rights to the mark.

A week-long evidentiary hearing was held in December 1985. A few months earlier, after learning that plaintiffs intended to release new records under the New Edition mark, defendants requested an "interim" injunction which this court denied. In affirming, the Court of Appeals clarified its earlier opinion, stating, "the district court should take a fresh look at the ownership issue in light of all the evidence." It further noted that "the prior ruling of the concurring judges in this case was not intended to designate Streetwise as the 'presumptive owner' of the name NEW EDITION." *Bell v. Streetwise Records, Ltd.*, 787 F.2d 578 (1st Cir.1986) (per curiam). Having examined all the evidence before me through the "new 'legal lens'" prescribed by the Court of Appeals, *id.* at 2 (quoting *Bell, supra,* 761 F.2d at 76), I conclude that plaintiffs are entitled to a preliminary injunction. Because they cannot sustain their ownership claim and have thus failed to show a likelihood of success on the merits, defendants' motion is denied.

## FINDINGS OF FACT AND RULINGS OF LAW

### Background

The five plaintiffs, calling themselves New Edition, form one of the hottest song-and-dance acts on the entertainment scene today. They have released four albums, numerous singles and several videos. They have performed throughout this country, filling major concert halls. They have toured Britain and Germany, and have plans for an upcoming trip to Japan. They have appeared on television shows, at charity events, and—the crowning sign of success—they have even been featured in a COKE commercial.[3]

The group got its start in 1981 when four of the five current members[4] performed in a talent show at Roscoe's Lounge, in Boston. They were each about thirteen years old at the time and they called themselves New Edition.[5] Travis Gresham, who knew Bell and Tresvant from the marching band he directed, saw the show and thought they had potential. Within a week or two he became their manager and Brook Payne, who had collaborated with Bell, Bivins and Brown on an earlier endeavor, became their choreographer.

Greshman booked a series of performances for the group. Their sixth engagement, on November 15, 1981, was the "Hollywood Talent Night" at the Strand Theatre, where the group performed a medley of songs made famous by the Jackson Five.[6] First prize and plaintiffs' goal for the night was a recording contract with Maurice Starr, president of defendant BIM, who originated and organized the event. New Edition came in second but Starr, who had an agenda of his own, decided to work with them anyway.

Maurice Starr, who partly from his "Hollywood Talent Nights" had become something of a local celebrity, had been in the music business for a long time.[7] Starr—

3. Notwithstanding these achievements, the court has only considered evidence relating to the period of time preceding plaintiffs' signing with MCA. Subsequent events are irrelevant to the issues to be decided.

4. Ronald DeVoe joined the group several months later.

5. The name was first used in 1978 when Bell, Bivins, Brown and two others formed a group under the direction of Mr. Brook Payne. Payne thought up the name. They performed for a couple of months and disbanded.

6. The Jackson Five was the enormously successful group of the late sixties and early seventies, comprised of five black youths, that featured superstar Michael Jackson.

7. It is not disputed here that Starr is a man of extensive and varied talents. Producer, engi-

originally Larry Johnson—performed with his five brothers in a rock band in the early seventies. Modelled after the Jackson Five, whom they sought to emulate, Starr and his brothers called themselves the Johnson Six. They achieved moderate success but broke up in the mid-seventies when they became too mature for the image.

It was around this time that Starr began developing the "concept," which, in its final form, he dubbed "black bubble gum music of the eighties." The concept is essentially the Jackson Five updated by the addition of modern elements like synthesizers (electronic instrumentation) and rap (speaking parts). As early as 1972 Starr began to search for the right kids to act out his concept. In November 1981, when he first encountered Bell, Bivins, Brown and Tresvant, he was still looking.

Although he decided to work with them, Starr believed plaintiffs were short on talent. They had no training to speak of; none could read or write music. Nevertheless, he used the four boys to create a demonstration tape of a song he had composed earlier, entitled Candy Girl. Starr played all the instruments, sang background vocals and did the arranging and mixing. He had to teach the thirteen-year-old group members everything, and while it is disputed whether lead singer Ralph Tresvant had to record his part bar-by-bar or note-by-note, it is clear Starr ran the show in the sound studio.[8]

The tape was completed in the winter of 1982, and Starr expended considerable effort attempting to sell it to a recording company. He finally connected with Streetwise in the following fall. In the meantime, under the supervision of Gresham and Payne, plaintiffs continued to rehearse their dance routines and to perform locally. Starr played little if any role in these activities.

During this period Starr and the group members had three disagreements, all stemming from Starr's desire to make the group more like the Jackson Five. First, Starr insisted they acquire a fifth member. The boys resisted, but Starr prevailed. Plaintiffs selected Ronnie DeVoe, a nephew of Brook Payne, whom Starr approved. Second, he wanted the group to grow "afros." They refused. Third, and perhaps most significant, he wanted the newly expanded group to change its name to the MaJic Five [sic];[9] the upper case "J," not suprisingly, to evoke "Jackson." Plaintiffs were adamantly opposed and remained New Edition.

In November and December of 1982, Streetwise entered into separate recording contracts with each of the five plaintiffs, who were at the time approximately age fourteen. Each contract granted to Streetwise the exclusive right to use the name. Each, except Tresvant's, confirmed that the name "The New Edition" was wholly owned by BIM.[10]

neer, songwriter, Starr testified that he plays "every instrument there is." He even created a literary version of the "concept"—a play called *Harmony*—about five kids trying to make it in the entertainment world.

8. The Court of Appeals observed that it might be significant if plaintiffs could show "they had dreamed of becoming nationally known." *Bell, supra,* 761 F.2d at 71. Accordingly, defendants presented evidence showing not only that plaintiffs lacked musical knowledge (thus supporting Starr's claim that he controlled the recordings), but also that plaintiffs' commitment to music was weak. They even elicited testimony that Brown preferred "hanging out" to rehearsing and that Michael Bivins—apparently the shortest member of the band—wanted to be a basketball player when he was "growing up." Aside

from the observation that Mr. Bivins appears still to be growing up, defendants cannot seriously be suggesting that his claim to the mark is affected by his having entertained more than one dream as a child. The totality of the evidence shows that plaintiffs wanted to become rock stars.

9. The term "magic," or "majic," has special significance in the music industry. It means charisma, appeal, that essential quality without which no group succeeds. It is the thing "a consumer is in love with," one witness testified.

10. Defendants have conceded that plaintiffs' disaffirmance of these contracts, because of their minority at the time of signing, is, for purposes of this proceeding, legally valid. Their claim to ownership of the mark is therefore based exclu-

Streetwise released the "Candy Girl" single in February 1983. The long-playing album—containing ten songs selected, produced, and for the most part written by Starr—came out the following June. Streetwise launched an unusually extensive and elaborate promotional campaign, placing advertisements in print and on radio, and producing three videos.[11] After the single was released, plaintiffs—high school students at the time—performed every weekend night, in Massachusetts and beyond. At first they "lip-synched" to a recorded track; later they sang to a live band. For a period of time Starr accompanied them on these tours, announcing the group, playing instruments (four simultaneously, he testified), and performing background vocals. The records and the group were smash hits.

Sometime in the summer of 1983 plaintiffs began to perform without Starr. In August, they fired Gresham and Payne. That same month they performed in Britain and Germany. In September they acquired new management and in November they disaffirmed their contracts with Streetwise. After defendants revealed plans to issue New Edition records featuring five different young singers, and after they sought federal registration of the New Edition mark,[12] plaintiffs commenced this lawsuit.

One postscript completes the evidentiary picture before the court. In January of 1984, Jheryl Busby, a senior vice president at MCA, was dragged by his fourteen-year-old son to see a performance of New Edition. None too impressed, he left to meet a friend at a nearby hotel. Young girls had swarmed the place. When he asked his friend what was going on he was told, "that group, New Edition, is staying here and those little girls have been look-

ing for them all night." Busby signed the group.

*Discussion*

A party seeking preliminary injunctive relief must satisfy four requirements: (1) that there is a likelihood of success on the merits; (2) that absent relief it will suffer irreparable harm; (3) that the harm it will suffer if an injunction is not granted outweighs the harm defendant will suffer if restrained; and (4) that injunctive relief is consistent with the public interest. *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006 (1st Cir.1981); *Kingsmen v. K-Tel International Ltd.*, 557 F.Supp. 178, 181 (S.D.N.Y. 1983).

Although neither side concedes any of these prerequisites, the primary focus was on the first—the likelihood of success on the merits.

In order to prevail on the merits, plaintiffs or defendants must establish that the mark is valid and protectable, that they own the mark, and that use of the mark by the opposing party is likely to confuse the public. *See, e.g., Estate of Presley v. Russen*, 513 F.Supp. 1339, 1362 (D.N.J.1981).

Both sides concede that New Edition is a distinctive mark, protectable under state and federal law; it is accordingly unnecessary to pass on that issue. They also concede, and the opinion of the Court of Appeals assumes, that use of the mark by both plaintiffs and defendants will lead to public confusion. Thus this court must decide the sole remaining issue: who owns the mark.

I.

 It is settled law that ownership of a mark is established by priority of appro-

---

sively on the law of trademarks and unfair competition.
 A great deal of testimony was offered at the December 1985 hearing concerning the circumstances of the signings. That evidence is irrelevant to this case as I now view the issues before me. Any unconscionability on the part of defendants, even if proven, would have no bearing on their ownership of the mark had they acquired it by means not contractual.

**11.** Streetwise also used an innovative device to market a single from the "Candy Girl" album, entitled "Popcorn Love." They sold a popcorn box, the type used in movie theaters, which contained a cassette and a New Edition tee shirt. Apparently it was not successful.

**12.** Defendants' application, which has no bearing on these proceedings, is apparently still pending.

priation. *Blanchard Importing & Distributing Co. v. Charles Gelman*, 353 F.2d 400, 401 (1st Cir.1965), *cert. denied*, 383 U.S. 968, 86 S.Ct. 1273, 16 L.Ed.2d 308 (1966). Priority is established not by conception but by bona fide usage. The claimant "must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory." *La Societe Anonyme des Parfums LeGalion v. Jean Patou, Inc.*, 495 F.2d 1265, 1272 (2d Cir.1974) (citing 3 Callmann, Unfair Competition, Trademarks & Monopolies § 76.2(d) (1969)).[13] While it is not required that a product be an instant success the moment it hits the market, its usage must be consistent with a "present plan of commercial exploitation." *Id.* at 1273. Finally, while the Lanham Act is invoked only through use in interstate commerce,[14] common law rights can be acquired through interstate *or* intrastate usage. *Noah's Inc. v. Nark, Inc.*, 560 F.Supp. 1253, 1258 (E.D.Mo.1983), *aff'd*, 728 F.2d 410 (8th Cir.1984) (citing *Weiner King, Inc. v. Weiner King Corp.*, 201 U.S.P.Q. 894, 908 (TTAB 1979)).

With these principles in mind, I make the following findings of fact. First, on the basis of testimony by Mr. Busby and by defendants' expert, Thomas Silverman, I find that there is only one relevant market at issue here: the entertainment market. Second, I find that as of the release of "Candy Girl" in February 1983—the first use in commerce—plaintiffs, calling themselves New Edition, had publicly performed in the local entertainment market on at least twenty occasions. Those performances (for which they frequently received compensation; albeit in nominal amounts), the promotional efforts by Travis Gresham on their behalf, their regular rehearsals with Gresham and Payne, their attempt to win a recording contract, and their hard work with Maurice Starr to further their career, all evidence a "present plan of commercial exploitation."

■ I accordingly conclude that plaintiffs have acquired legal rights to the mark New Edition through their prior use in intrastate commerce. Even if defendants' use had been the first in interstate commerce, they used the name simultaneously in Massachusetts, where plaintiffs had already appropriated it. And while it is well recognized that a junior user may occasionally acquire superior rights to a mark it used in good faith and in a different market, *see* 2 J. McCarthy, Trademarks and Unfair Competition, § 26:3 at 289–292 (2d ed. 1984), and cases cited therein, that was obviously not the case here. On this basis alone, plaintiffs own the mark.

## II.

■ Even assuming there was no prior appropriation by the plaintiffs, however, they nonetheless own the mark under the controlling standard of law. Defendants correctly state that in the case of joint endeavors, where prior ownership by one of several claimants cannot be established, the legal task is to determine which party "controls or determines the nature and quality of the goods which have been marketed under the mark in question." *See In re Polar Music International AB*, 714 F.2d 1567 (Fed.Cir.1983). The difficulty in performing that task in this case, however, is in deciding what the "goods" are. The parties have given the court little guidance in how to go about making that determination. Rather, each side baldly asserts the result that leads most logically to a decision in its favor. Defendants claim the goods are the recordings; plaintiffs claim they are the entertainment services of Bell, Bivins, Brown, DeVoe and Tresvant.

■ The role of "public association" in determining ownership has been much dis-

---

**13.** In the cited case it was determined that eighty-nine sales over a twenty year period, at a total profit of $100, were insufficient to "constitute [the] good faith commercial exploitation" necessary to establish bona fide usage.

**14.** Plaintiffs appeared to argue in their post-hearing brief that attendance at their concerts by out-of-staters, together with Starr's use of the mails and telephone lines to sell the demonstration tape, created, on their behalf, interstate use in commerce. They cited no authority for this novel proposition.

puted in this case.[15] Defendants have argued, and the Court of Appeals has confirmed, that the "finding that the public associate[s] the name NEW EDITION with the plaintiffs [does not compel] the conclusion that the name belong[s] to the plaintiffs." *Bell, supra,* 761 F.2d at 76. *See, e.g., Wallpaper Mfgrs. Ltd. v. Crown Wallcovering Corp.,* 680 F.2d 755, 762 (C.C.P.A.1982) ("Trademark rights are neither acquired or lost on the basis of comparative popularity....") But defendants are wrong when they say that public association plays no part in determining ownership. It is crucial in establishing just what the mark has come to identify, i.e., what the "goods" are. 1 J. McCarthy, *Trademarks and Unfair Competition,* § 16:14 at 755–57 (2d ed. 1984).

In order to determine ownership in a case of this kind, a court must first identify that quality or characteristic for which the group is known by the public.[16] It then may proceed to the second step of the ownership inquiry, namely, who controls that quality or characteristic.[17] 1 J. McCarthy, *supra,* § 16:14 at 757. *See also General Business Services, Inc. v. Rouse,* 208 U.S.P.Q. 893, 900 (E.D.Penn.1980); *Five Platters, Inc. v. Purdie,* 419 F.Supp. 372 (D.Md.1976).

As a preliminary matter, I find that the norm in the music industry is that an artist or group generally owns its own name. This case does not fit into one of the clearer exceptions to this rule. The name New Edition has not been assigned, transferred, or sold. *See, e.g., Kingsmen v. K–Tel International Ltd., supra; Marshak v. Green,* 505 F.Supp. 1054 (S.D.N.Y.1981); *Rare Earth, Inc. v. Hoorelbeke,* 401 F.Supp. 26 (S.D.N.Y.1975). Nor is New Edition a "concept group," whose name belongs to the person or entity that conceived both concept and name.[18] *Compare O & L Associates v. Del Conte,* No. 83–7939, slip op. (S.D.N.Y. Dec. 3, 1984).

With respect to defendants, although Maurice Starr's contribution to the "Candy Girl" records was substantial, I find that all the functions he performed were consistent with the duties of a producer. He was credited and compensated separately for each role. Similarly, while Streetwise's promotional work was unusually extensive, and though it proceeded at considerable

15. Defendants correctly argue that the principal significance of "public association" in trademark law is in determining whether a suggestive-descriptive mark has acquired secondary meaning and is thus legally protectable. *See* 3 R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies,* § 19.25 at 78–79 (4th ed. 1983).

16. "Whether the service mark or name identifies and distinguishes [a] particular performer combination or just style and quality would be a matter of fact." 1 J. McCarthy, *supra,* § 16:14 at 755.

17. Language in the opinion of the Court of Appeals has led the parties to occasionally frame the "control" issue in terms of "who employed whom." *See also Rick v. Buchansky,* 609 F.Supp. 1522 (S.D.N.Y.), *appeal dismissed,* 770 F.2d 157 (2d Cir.1985). I find that the evidence does not support the contention that either defendants or plaintiffs were employers or employees. Furthermore, the correct legal question in this context is not who controlled whom, but who controlled the distinctive feature which the mark identifies.

In any event, it is not surprising—nor is it of great legal moment—that if you put an experienced adult in a room with inexperienced children, he will be telling them what to do and not the reverse.

18. Defendants' expert Thomas Silverman testified at length about "concept groups." They are formed mainly by independent record companies who, perceiving an unfilled "niche" in the entertainment market, hire a group to promote their "concept," or marketing idea. The record company owns the name and controls the product.

Examples Silverman gave of "concept groups" include "Menudo," "The Monkees," and "Planet Patrol." "Menudo" is a band whose members are retired when they reach age 14; public auditions are held to fill the ranks. "Planet Patrol" was Silverman's own creation. He invented the name and issued a record under it before he had even hired the group which it later identified.

I find that New Edition was never a concept group. Unlike the groups Silverman described, plaintiffs selected their name and performed under it before meeting Maurice Starr. They may have walked straight into Starr's concept but, as he conceded at the hearing, they seem to have had the same idea he had.

risk, marketing—or "educating your label," as one witness put it—is a normal function of a recording company.

With respect to the plaintiffs themselves, as noted elsewhere in this opinion, they existed and performed as New Edition long before defendants released "Candy Girl." They had already used songs of the Jackson Five. Their membership has been essentially constant;[19] they were not, as defendants contend, replaceable actors in a play written by Maurice Starr. (*Compare Rick v. Buchansky, supra,* where the four-person "Vito and the Salutations" had had twenty-two different members, including ten different "Vitos," to its one manager, Rick—who was found to own the name.) They were individual persons that the public came to know as such. While defendants would have us believe this is only the result of their successful promoting, I find that it was personality, not marketing, that led to the public's intimacy with plaintiffs. The "magic" that sold New Edition, and which "New Edition" has come to signify, is these five young men.

Based on the totality of the evidence, I conclude that the quality which the mark New Edition identified was first and foremost the five plaintiffs with their distinctive personalities and style as performers. The "goods" therefore are the entertainment services they provide. They and no one else controlled the quality of those services. They own the mark.

## CONCLUSION

I accordingly conclude that plaintiffs have demonstrated a likelihood of success on the merits, and that defendants have failed to do so. I am also persuaded by the testimony of Jheryl Busby, that failure to enjoin defendants would irreparably injure plaintiffs by weakening the mark—far in excess of the minor injury this injunction will cause defendants. Finally, as the Court of Appeals has made plain, the public

interest will best be served by an exclusive award of the name.

For all these reasons, plaintiffs' motion requesting a preliminary injunction is allowed. Defendants' motion is denied. Plaintiffs shall prepare and the parties shall attempt to agree on a form of injunction. If they are unable to agree, plaintiffs shall file their proposal and defendants their objections no later than June 25, 1986.

---

**19.** Brown's 1985 departure is not a substantial change, particularly as the group does not intend to replace him. More important, however,

it occurred beyond the relevant time frame of this case. *See* note 3, *supra.*