This Opinion is a
Precedent of the TTAB

Mailed: June 30, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

‾‾‾‾

Trademark Trial and Appeal Board

‾‾‾‾

*Wonderbread 5*
*v.*
*Patrick Gilles a/k/a Wonderbread 5 and/or Wonderbread Five*

‾‾‾‾

Cancellation No. 92052150
against Registration No. 3691948

‾‾‾‾

David M. Given of Phillips Erlewine Given & Carlin LLP,
    for Wonderbread 5.[1]

Matthew H. Swyers of The Trademark Company PLLC,
    for Patrick Gilles a/k/a Wonderbread 5 and/or Wonderbread Five.

‾‾‾‾

Before Lykos, Hightower and Masiello,
    Administrative Trademark Judges.

Opinion by Lykos, Administrative Trademark Judge:

Band members frequently come and go. This case involves a dispute about who owns the band's name in the wake of the departure of one of the band's five members.

---

[1] Petitioner's trial briefs were submitted by Cari A. Cohorn, formerly of Phillips Erlewine Given & Carlin LLP.

On October 6, 2009, Patrick Gilles ("Respondent" or "Gilles") obtained a registration on the Principal Register for the mark **WONDERBREAD 5**, in standard character format, for "[e]ntertainment services in the nature of live musical performances" in International Class 41.[2] Less than five months later, on March 1, 2010, Wonderbread 5 ("Petitioner") filed a petition to cancel the registration. As set forth in the petition to cancel, Petitioner alleges that Respondent committed fraud in obtaining his registration and asserts a claim of priority and likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d). Petitioner also made allegations which we construe as an ownership claim against Respondent, namely that Respondent did not own the mark at issue at the time he filed the application underlying his registration; that the application was therefore void *ab initio*; and that the resulting registration is invalid. *See* Trademark Act Section 1(a), 15 U.S.C. § 1051(a). Petitioner's claims are based in part on allegations that

> Petitioner is a decade-plus old musical group named WONDERBREAD 5, based in the San Francisco Bay area, and composed of the following members: Jeffrey Fletcher, John McDill, Thomas Rickard, Christopher Adams and Michael Taylor (individually and collectively, the "Band"). Since its inception, the Band has operated as a general partnership. Petition to Cancel ¶ 1.

> Petitioner has performed and continues to perform under the name WONDERBREAD 5 for over ten years, and during that time, has developed a substantial client and fan base. As a result, the Wonderbread 5 name has become well-known in the San Francisco Bay Area and beyond as referring to the Band. *Id*. at ¶ 3.

---

[2] Registration No. 3691948, alleging October 31, 1996 as the date of first use anywhere and in commerce. The underlying application was filed on March 12, 2009.

For the past 12 years, the Band has maintained the website located at www.wonderbread5.com as a promotional vehicle and means of keeping its fans updated about future performances and other news concerning the Band. *Id.* at ¶ 4.

In light of the Band's continuous use in commerce of the name WONDERBREAD 5 and the fact that it is universally known by that name, the Band is the rightful owner of the WONDERBREAD 5 mark (the "Mark."). *Id.* at ¶ 5.

Respondent, an individual residing in Mill Valley, California "is a former member of the Band" and "left the Band on or about March 9, 2009" and ceased to be a band member or member of the general partnership. *Id.* at ¶¶ 2 and 6.

Three days after he was terminated by the Band, Respondent filed the underlying application for the involved registration "without the knowledge or consent of the Band." *Id.* at ¶ 7.

On June 17, 2009, Respondent filed a Complaint against the Band, its individual members, and its agent and manager in San Francisco Superior Court. *Id.* at ¶ 8.

Pursuant to California Code of Civil Procedure 998 (a provision under California state law that promotes settlement) Petitioner served Respondent with "an Offer to Compromise" which was accepted on October 1, 2009. *Id.* at ¶¶ 10-12.

Petitioner remitted payment to Respondent for his "interest" in the Band on October 8, 2009 and the complaint was dismissed with prejudice on October 22, 2009. "As such Mr. Giles released all claims in and to the Band, including the name WONDERBREAD 5." *Id.* at ¶¶ 10-12.

During the course of the litigation, Respondent did not disclose that he had filed an application for the mark WONDERBREAD 5. *Id.* at ¶ 14.

After settlement of the above litigation, Petitioner discovered that Respondent had registered the domain

name thewonderbread5.com and created a new MySpace page under the name "thewonderbread5." "[T]he Band received many calls and emails from fans and clients inquiring as to why [Respondent] appeared to be operating under the Wonderbread5 name." *Id*. at ¶¶ 15-17.

At the time he filed his application, Respondent "clearly knew that the term 'WONDERBREAD 5' had been previously used, and was continuing to be used, by the Band." *Id*. at ¶ 19.

On information and belief, Respondent misrepresented the nature of his use in commerce of the Mark and misrepresented his rights to the Mark at the time he submitted his Application and continued to prosecute the trademark application leading to the registration that is the subject of this petition. *Id*. at ¶ 21.

Respondent, in his answer to the petition to cancel, denied the salient allegations therein.

The parties have fully briefed the case.

## I. Evidentiary Issues

Before turning to the substantive claims before us, we address various evidentiary issues.

### A. *Petitioner's Objections*

Petitioner objects to and has moved to strike the entirety of the testimony deposition of Respondent (Patrick Gilles) dated December 11, 2013 and the exhibits attached thereto on the ground that Respondent failed to properly and timely serve pretrial disclosures pursuant to Trademark Rule 2.123(c), 37 C.F.R. § 2.123(c). Respondent sent his disclosures to an incorrect address and to the attention of an attorney who was no longer employed by Petitioner's law firm at the time of service.

Petitioner also objects to the exhibits proffered by Respondent during the Gilles testimony deposition on the ground that Respondent failed to specify in his pretrial disclosures a general summary or list of the types of documents and things which he intended to introduce as exhibits.

Respondent's pretrial disclosures were due November 1, 2013. (24 & 25 TTABVUE). According to Petitioner, on November 27, 2013, counsel for Petitioner notified Respondent that no pretrial disclosures had been received and objected to the taking of any testimony; on December 2, 2013, Respondent emailed his disclosures to Petitioner with an explanation that they were inadvertently sent to the former address for Petitioner's counsel, but the disclosures did not provide a summary or list of documents expected to be introduced at trial. Petitioner further points out that after Respondent was apprised of the defects, Respondent failed to supplement his pretrial disclosures. In response, Respondent argues that to strike the entirety of his testimony deposition is "too harsh of a remedy" in light of the fact that the pretrial disclosures were eventually received (albeit late) and the critical nature of his testimony, given that he is a party witness and the sole witness who testified on Respondent's behalf.

Trademark Rule 2.121(e), 37 C.F.R. § 2.121(e), provides in relevant part:

> …no later than fifteen days prior to the opening of each testimony period, or on such alternate schedule as may be provided by order of the Board, the party scheduled to present evidence *must disclose the name and, if not previously provided, the telephone number and address of each witness from whom it intends to take testimony*, or may take testimony if the need arises, general identifying information about the witness, such as relationship to any party, including job title if employed by a party, or, if

> neither a party nor related to a party, occupation and job title, a general summary or list of subjects on which the witness is expected to testify, and *a general summary or list of the types of documents and things which may be introduced as exhibits during the testimony of the witness.*

(Emphasis added). In the event improper or inadequate pretrial disclosures are served, Trademark Rule 2.123(e)(3), 37 C.F.R. § 2.123(e)(3), provides in relevant part:

> A motion to strike the testimony of a witness for lack of proper or adequate pretrial disclosure may seek exclusion of the entire testimony, when there was no pretrial disclosure, or may seek exclusion of that portion of the testimony that was not adequately disclosed in accordance with § 2.121(e).

The Board, depending on the circumstances presented, considers the following five-factor test: 1) the surprise to the party against whom the evidence would be offered; 2) the ability of that party to cure the surprise; 3) the extent to which allowing the testimony would disrupt the trial; 4) the importance of the evidence; and 5) the nondisclosing party's explanation for its failure to disclose the evidence. *Great Seats Inc. v. Great Seats Ltd.,* 100 USPQ2d 1323, 1327 (TTAB 2011) (citing *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)). *See also MicroStrategy, Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1357, 77 USPQ2d 1001, 1009-10 (Fed. Cir. 2005) (applying *Southern States* factors in excluding non-expert damages evidence as a sanction for late disclosure).

Prior to Respondent's deadline for serving pretrial disclosures, counsel for Petitioner filed with the Board and served Respondent its new correspondence address and name of its newly appointed attorney. *See* "Change of Correspondence

Address" dated May 31, 2013 (21 TTABVUE 1).[3] It is undisputed that Respondent's pretrial disclosures were improperly served at Petitioner's counsel's former address to the attention of an attorney no longer representing Petitioner and therefore were received by Petitioner over one month late. It is also clear that the pretrial disclosures identify Respondent's intent to take the testimony of one individual (Respondent himself) with a general summary or list of subjects on which Respondent was expected to testify (i.e., "history and ownership of the WONDERBREAD 5 mark; scope of services offered by Registrant under the Registrant's mark") but that the disclosures fail to identify "a general summary or list of the types of documents and things which may be introduced as exhibits during the testimony of the witness" (for example, email correspondence between Respondent and other band members) as required by Trademark Rule 2.121(e), 37 C.F.R. § 2.121(e). Instead, the disclosures merely state "[t]o support its claims, Registrant may introduce exhibits to be identified in a Notice of Reliance." An offering party cannot use a notice of reliance for any or all "exhibits" insofar as some items require identification and foundation necessarily provided by a witness. Indeed, only certain types of evidence such as official records and printed publications as described in Trademark Rule 2.122(e), 37 C.F.R. § 2.122(e), may be made of record via notice of reliance. *See generally Trademark Trial and Appeal Board Manual of Procedure* ("TBMP") § 704 (2014) (describing types of evidence

---

[3] For the citations to the record in TTABVUE throughout the decision, the number preceding "TTABVUE" corresponds to the docket entry number; the number(s) following "TTABVUE" refer to the page number(s) of that particular docket entry. *See, e.g., Turdin v. Trilobite, Ltd.,* 109 USPQ2d 1473 (TTAB 2014).

admissible by notice of reliance).[4] Respondent had ample opportunity to supplement his disclosures to summarize the type of documents and things, other than notices of reliance, which he anticipated introducing as exhibits during his testimony, but failed to do to so.

It is highly unlikely that Petitioner was surprised that Respondent, as the defendant in this proceeding, intended to testify. Indeed, his testimony is critical to analyzing Petitioner's factually intensive claims of non-ownership and fraud. We are also cognizant of the fact that the disclosures were indeed timely mailed, albeit to counsel for Petitioner's former address, and were eventually received by Petitioner's current counsel.

Nonetheless, the disclosures are defective to the extent that they fail to summarize the types of documents and things Respondent intended to introduce as exhibits to his testimony. Therefore, while we decline to strike the entirety of Gilles' testimony, we hereby strike all forty-six (46) exhibits attached thereto and all portions of his testimony referring to the attached exhibits. Thus, Petitioner's objections are in part sustained and in part overruled.[5]

---

[4] Pretrial disclosures are not required for plans to file a notice or notices of reliance at trial. Trademark Rule 2.121(e); 37 C.F.R. § 2.121(e).

[5] In light of our ruling, Petitioner's specific objections to the documents attached to Respondent's testimony deposition on the grounds that the documents were not produced during discovery are moot.

B. **Petitioner's Notice of Reliance**

Petitioner submitted under notice of reliance an affidavit from Respondent, Patrick Gilles, dated July 18, 2011,[6] without obtaining a stipulation to do so from Respondent under Trademark Rule 2.123(b), 37 C.F.R. § 2.123(b). Trademark Rule 2.123(l), 37 C.F.R. § 2.123(l), provides that "evidence not obtained and filed in compliance with these sections will not be considered." As such, the Gilles affidavit has not been considered. *See, e.g., Calypso Technology Inc. v. Calypso Capital Management LP*, 100 USPQ2d 1213, 1216-19 (TTAB 2011) (several affidavits submitted by plaintiff under notice of reliance not considered because the parties did not stipulate that testimony could be submitted by affidavit).

Petitioner also submitted under notice of reliance Respondent's answers to Petitioner's First Request for Admissions which include both admissions and denials. While the admissions are properly of record, the denials are not. Trademark Rule 2.120(3)(i), 37 C.F.R. § 2.120(3)(i). *See, e.g., Turdin v. Trilobite, Ltd.,* 109 USPQ2d at 1477 (concurrent use defendant's objection to submission of denial to request for admission sustained; "rule does not extend to denials"). "[U]nlike an admission (or a failure to respond which constitutes an admission), the *denial* of a request for admission establishes neither the truth nor the falsity of the assertion, but rather leaves the matter for proof at trial. *Cf.* Fed. R. Civ. P. 36(b)."

---

[6] The affidavit was submitted as part of Respondent's response to Petitioner's motion for summary judgment. Evidence submitted in connection with a summary judgment motion is of record only for consideration of said motion. Any such evidence to be considered at trial must be properly introduced in evidence by a party during the appropriate testimony period pursuant to the rules and procedure governing the submission of evidence at trial. *See Levi Strauss & Co. v. Josephs Sportswear Inc.,* 28 USPQ2d 1464 (TTAB 1993); *Pet Inc. v. Bassetti,* 219 USPQ 911 (TTAB 1983).

*Life Zone Inc. v. Middleman Group Inc.*, 87 USPQ2d 1953, 1957 (TTAB 2008) (denials to requests for admission inadmissible). *See also* TBMP § 704.10 (2014).

## II.   The Record

Pursuant to Trademark Rule 2.122, 37 C.F.R. § 2.122, the record includes Respondent's registration file and the pleadings.

In addition, Petitioner submitted a Notice of Reliance (filed October 17, 2013) consisting of the following items: Petitioner's First Set of Requests for Admission and Respondent's responses regarding the authenticity of Exhibits 1-10 attached thereto (Exhibits A-C); Petitioner's First Set of Interrogatories and Respondent's responses thereto (Exhibits D-F); and the discovery deposition of Respondent with Exhibits 1-26 attached thereto (Exhibit G). Petitioner also submitted the following testimony depositions with exhibits attached:

- Thomas Rickard, a member of Petitioner's band ("Rickard Deposition");

- Jay Siegan, owner of Jay Siegan Presents, an "event production and artist management company" ("Siegan Deposition");

- Stevenson Lee Brooks, a former member of Petitioner's band ("Brooks Deposition");

- Clay Bell, a substitute musician for Petitioner's band ("Bell Deposition"); and

- Charles Fraser Lunney, a substitute musician for Petitioner's band ("Lunney Deposition").

Respondent's evidence consists of his own testimony deposition ("Gilles Deposition"), without the accompanying exhibits pursuant to our evidentiary ruling noted above.

### III. Standing

Respondent challenges Petitioner's standing.[7] A plaintiff in a Board proceeding must prove its standing as a threshold matter in order to be heard on its substantive claims. *See, e.g., Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982). The purpose of the standing requirement is to prevent mere intermeddlers from initiating proceedings, and derives its basis in cancellation proceedings from Section 14 of the Trademark Act which provides in relevant part that "[a] petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed as follows by any person who believes that he is or will be damaged…." The Court of Appeals for the Federal Circuit has enunciated a liberal threshold for determining standing, namely, whether a plaintiff's belief in damage has a reasonable basis in fact and reflects a real interest in the case. *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1028 (Fed. Cir. 1999). *See also Jewelers Vigilance Committee Inc. v. Ullenberg Corp.*, 853 F.2d 888, 7 USPQ2d 1628 (Fed. Cir. 1988).

Petitioner has established that it has rendered live musical performances under the name WONDERBREAD 5. Petitioner has also demonstrated its presence on the Internet and in social media with evidence that it owns and operates: a website under the domain name www.wonderbread5.com displaying the mark WONDERBREAD 5; a Twitter account displaying the mark WONDERBREAD 5 with "tweets" under the handle "Wonder Bread 5"; a MySpace page under the

---

[7] Both parties, in arguing the issue of standing, are under the misimpression that Petitioner must prove that it is the senior user of the mark WONDERBREAD 5 in order to establish its standing.

domain www.myspace.com/wonderbread5 entitled "Wonder Bread 5's Blog"; a Facebook event page under the name "Wonder Bread 5"; and a YouTube page under the name "Wonderbread5Band" with uploaded videos of live musical performances. Rickard Deposition Exhibits A-D, F (31 TTABVUE 111-366). As an entity that uses the mark WONDERBREAD 5 in rendering live musical performances and in social media to identify itself, Petitioner has shown that it is not a mere intermeddler, but has a real interest, that is to say, "a direct and personal stake" in the outcome of this proceeding. *See Ritchie v. Simpson,* 50 USPQ2d at 1027. Petitioner has therefore established its standing to petition to cancel Respondent's registration.

## IV. Petitioner's Ownership Claim

Petitioner claims that Respondent's registration is void *ab initio* because Gilles was not the owner of the mark WONDERBREAD 5 at the time he filed the underlying application. Petitioner also separately alleges a likelihood of confusion under Section 2(d), based primarily on the fact that Petitioner, not Respondent, owns the trademark for which Respondent was granted a registration.[8] With regard

---

[8] Ownership of a proprietary interest in a mark is an element of any *inter partes* 2(d) claim. Section 2(d) challenges may be based either on ownership of a registered mark (which is not implicated here) or prior use of an identical or similar mark. *See, e.g., Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1378 (Fed. Cir. 2002) ("[A] party petitioning for cancellation under section 2(d) must show that it had priority and that registration of the mark creates a likelihood of confusion. … To establish priority, the petitioner must show proprietary rights in the mark that produce a likelihood of confusion.") (citation omitted); *T.A.B. Sys. v. Pactel Teletrac*, 77 F.3d 1372, 37 USPQ2d 1879, 1881 (Fed. Cir. 1996) ("In an opposition founded on section 2(d), the opposer must establish its own prior proprietary rights in the same or a confusingly similar designation in order to defeat the application."); *The Land-O-Nod Co. v. Paulison*, 220 USPQ 61, 65 (TTAB 1983) ("One who opposes registration to an applicant under Section 2(d) … must prove that he has proprietary rights in the term he relies upon to demonstrate likelihood of confusion as to source, whether by ownership of a registration, prior use of a technical 'trademark,' prior use in advertising, prior use as a trade name, or whatever other type of

to the Section 2(d) claim, when the parties are claiming rights in the same mark for the same goods or services, likelihood of confusion is inevitable. Moreover, when both parties are relying upon activities the two conducted in concert with one another, each in an attempt to establish prior rights in a mark over the other, the dispute centers on ownership of the mark. *See, e.g.*, *Nahshin v. Product Source Int'l LLC*, 107 USPQ2d 1257, 1258 (TTAB 2013) ("Although the proceeding was brought on the ground of priority/likelihood of confusion, the actual issue in this matter is ownership of the mark NIC-OUT/NIC OUT in the United States, as the cigarette filters that respondent sells under the mark NIC OUT are the same filters that petitioner arranged to have manufactured under the mark NIC-OUT.").

We therefore focus our discussion on who owns the mark WONDERBREAD 5. It is Petitioner's burden as plaintiff in the proceeding to establish prior ownership by a preponderance of the evidence. *See, e.g.*, *Metro Traffic Control, Inc. v. Shadow Network Inc.*, 104 F.3d 336, 41 USPQ2d 1369, 1372 (Fed. Cir. 1997).

Petitioner takes the position that, despite the absence of any written agreement, it owns the mark WONDERBREAD 5 as a partnership under California law; that the partnership is currently composed of musicians Jeffrey Fletcher, Thomas Rickard, Christopher Adams, Michael Taylor and the band's manager and booking agent, Jay Siegan (who became a partner in 1999); that Respondent, Patrick Gilles,

---

use may have developed a trade identity.") (citation and internal quotation marks omitted); *see also Person's Co. v. Christman*, 900 F.2d 1565, 14 USPQ2d 1477, 1479 (Fed. Cir. 1990) (use of a trademark is what gives rise to ownership rights). In most cases under Section 2(d) the ownership issue is not seriously contested. But contested or not, ownership of a trademark is inherent in any assertion of a Section 2(d) bar. Here, it is contested, because the parties are litigating over the very same mark.

was a member of the partnership at one time but that two days following Respondent's termination from the partnership Respondent filed the underlying application which matured into the involved registration without the partnership's knowledge or consent; that Respondent then concealed the existence of the application during subsequent litigation brought by Respondent against Petitioner in California state court;[9] that Respondent retained no trademark rights in the mark when he was terminated from the partnership; and that any rights Respondent had in the mark WONDERBREAD 5 were extinguished with Respondent's acceptance of the offer to compromise which settled the state court litigation by means of a buy-out from the partnership and release from all future claims.[10] Petitioner relies on the provisions set forth under California law, namely, California Corporations Code § 16202(a) which, according to Petitioner, provides in general that "the association of two or more persons to carry on as co-owners a

---

[9] *Patrick Gilles, an individual, on behalf of himself vs. Jeffrey Fletcher, John McDill, Thomas Rickard, Christopher Adams, Michael Taylor, Jay Siegan, Jay Siegan Presents and Wonderbread 5, a California general partnership… (collectively, defendants)*, Superior Court of California County of San Francisco, Case No. CGC-09-489573. *See* copy of complaint (30 TTABVUE 108).

[10] The defendants in the state court litigation presented the Offer to Compromise pursuant to CCP § 998 to plaintiff Gilles on September 3, 2009. Gilles accepted it on October 3, 2009. It reads in pertinent part:

> Pursuant to Code of Civil Procedure § 998, defendants JEFFREY FLETCHER, JOHN MCDILL, THOMAS RICKARD, CHRISTOPHER ADAMS, MICHAEL TAYLOR, JAY SIEGAN, JAY SIEGAN PRESENTS and WONDERBREAD 5 (collectively, defendants), jointly offer to compromise this dispute for payment to the plaintiff in the total sum of THIRTY-THOUSAND DOLLARS ($30,000.01) and ONE CENT, inclusive of reasonable attorney's fees and costs incurred to the date of this offer and otherwise in satisfaction of all claims for damages, costs, expenses, attorney's fees and interest in this action.

Petitioner's Notice of Reliance Ex. C (26 TTABVUE 257). The suit was then dismissed with prejudice on October 22, 2009.

business for profit forms a partnership, whether or not the persons intend to form a partnership." Petitioner's Brief, p. 5 n.8.

Respondent concedes that under California state law, a general partnership named Wonderbread 5 existed, but argues that the partnership consisted of himself and Fletcher as the sole founding members and that Respondent owned a 50% interest in the partnership. He further maintains that the state court litigation in San Francisco cannot be dispositive of Petitioner's claim of nonownership by Respondent because the Offer to Compromise related solely to monetary relief and made no mention of trademark rights in the mark WONDERBREAD 5.

Section 1(a)(1) of the Trademark Act of 1946, 15 U.S.C. § 1051(a)(1), provides as follows:

> The owner of a trademark used in commerce may request registration of its trademark on the principal register by paying the prescribed fee and filing in the Patent and Trademark Office an application and a verified statement …

Accordingly, only the owner of the mark may file an application. *In re Wella A.G.,* 787 F.2d 1549, 229 USPQ 274 (Fed. Cir. 1986) (C.J. Nies concurring) ("Under section 1 of the Lanham Act, only the *owner* of a mark is entitled to apply for registration."); *In re Deister Concentrator Co.*, 289 F.2d 496, 129 USPQ 314, 320 (CCPA 1961) ("Under section 1, only 'The owner of a trade-mark' can apply for registration."); *Great Seats Ltd. v. Great Seats Inc.*, 84 USPQ2d 1235, 1239 (TTAB 2007). "It is fundamental that ownership of a mark is acquired by use, not by registration." *Holiday Inn v. Holiday Inns, Inc.*, 534 F.2d 312, 189 USPQ 630, 635 n.6 (CCPA 1976); *accord Jean Patou, Inc. v. Theon, Inc.*, 9 F.3d 971, 29 USPQ2d

1771, 1774 (Fed. Cir. 1993) ("Trademark ownership results only from use, not from registration."); *see also Huang v. Tzu Wei Chen Food*, 849 F.2d 1458, 7 USPQ2d 1335, 1336 (Fed. Cir. 1988) (affirming Board's holding that an application was void *ab initio* because the applicant was not the owner of the mark on the filing date); *American Forests v. Sanders*, 54 USPQ2d 1860, 1864 (TTAB 1999) (intent-to-use application filed by individual void where the actual entity possessing the *bona fide* intention to use the mark was a partnership comprised of the individual and her husband). In cases such as this where the parties have either a prior or current relationship, the question of whether the individual or the business entity is, in fact, the owner of the mark "must be determined on a case by case basis dependent on the particular facts adduced in each case." *In re Briggs*, 229 USPQ 76, 77 (TTAB 1986) (citing *Monorail Car Wash Inc. v. McCoy*, 178 USPQ 434, 437-38 (TTAB 1973)).

Although both Petitioner and Respondent agree that a partnership did exist, the precise composition of the partnership is in dispute. Because there was no written partnership agreement or any other type of agreement between Petitioner and Respondent regarding ownership or use of the involved mark, we must examine the totality of the record evidence.

First, we examine the parties' statements and actions at the time Respondent was terminated from the band (which was around the time he filed the application at issue) and in the legal proceedings that ensued. The preponderance of this evidence shows that at the time Respondent filed his application, Respondent was not, individually, the owner of the mark WONDERBREAD 5 for live musical

performance services. Initially, we note that Respondent's own characterization of the partnership as having two members (himself and Fletcher) is inconsistent with his claim to have owned the mark as an individual, inasmuch as there is no evidence to show that Respondent used the mark himself prior to the partnership or that he used it himself with the partnership's authorization; nor is there any evidence of a transfer to Respondent of Fletcher's partnership share. We also note the termination email Petitioner's attorney sent to Respondent the same day Respondent filed his application, informing Respondent that his rights in the Wonderbread 5 partnership had been relinquished. In pertinent part, the email states:

> I've been asked to contact you on behalf of Jeffrey Fletcher, Thomas Rickard, Christopher Adams, and John McDill, the members of the musical group professionally known as "Wonderbread 5" (hereinafter referred to as "Artist"). This email is in furtherance to the verbal communication between you and Christopher Adams on behalf of the band on Monday March 9, 2009.
>
> It is with regret that the other members of Artist have decided unanimously that you shall no longer be a member. It has taken a long time to reach, and they are greatly saddened by this difficult decision. They feel that notwithstanding considerable efforts to improve communications with you, including through professional mediation and other means, the relationship between you and the other members has been strained to the point that it has become irreconcilable.
>
> Please be advised that Artist shall perform and conduct business under the name "Wonderbread 5", that you shall relinquish all rights in the partnership business, and shall no longer be entitled to any and all future proceeds from Artist's live performance engagements and other business activities.

Email from Barry Simons, Law Office of Barry Simons, San Francisco, California to Respondent dated March 12, 2009. (26 TTABVUE 337-38).

Shortly after receipt of this email, Respondent retained legal counsel, who, on Respondent's behalf, responded as follows:

> Our office has been retained to represent Mr. Gilles with respect to his interest in the performing musical group entitled Wonderbread5 ("the Partnership")....
>
> This letter is to acknowledge receipt of your email letter to Mr. Gilles dated March 12, 2009.
>
> Wonderbread5 is a general partnership within the meaning of California Corporations Code 16202. ...Please consider this letter as a formal demand for all books and records of the Partnership pursuant to 16403(b).
>
> Your attempt to disassociate Mr. Gilles from the Partnership is improper and is, by this letter, formally rejected. If the Partnership desires to dissociate Mr. Gilles it must do so by unanimous agreement and in compliance with the buyout requirements of 16701 and specifically of course subsection (g) which provides:
>
>> "The payment or tender required by subdivision (e) or (f) shall be accompanied by all of the following:
>> (1) A statement of partnership assets and liabilities as of the date of dissociation.
>> (2) The latest available partnership balance sheet and income statement, if any.
>> (3) An explanation of how the estimated amount of the payment was calculated."

Letter from Douglas B. Wroan of The Wroan Law Firm Inc. dated March 30, 2009 to Barry Simons of the Law Office of Barry Simons (26 TTABVUE 391-92). Prior to filing the complaint in California state court, counsel for Respondent presented the first offer to compromise the dispute for a payment of $ 332,468.[30], representing Respondent's asserted buyout interest in the partnership. Letter from Douglas B.

Wroan of The Wroan Law Firm Inc. dated April 20, 2009 to Barry Simons of the Law Office of Barry Simons (26 TTABVUE 393-94). Following Petitioner's rejection of the offer, Respondent filed the civil complaint.

In the subsequent civil litigation that ensued in San Francisco Superior Court, Respondent named the California general partnership Wonderbread 5 and each of the band members individually as defendants. (26 TTABVUE 339). He also identified himself as "Patrick Gilles, an individual, on behalf of himself." *Id.* We view the manner in which Respondent named the parties in the civil suit as a tacit acknowledgment that a partnership existed distinct from himself.

In addition, the settlement of that suit, embodied in the second Offer to Compromise of September 15, 2009, lends further support to the finding that, at the time the underlying application was filed, a partnership, not Respondent individually, was the true owner of the mark WONDERBREAD 5 for the musical performance services identified in the registration. The Offer to Compromise was presented by Petitioner's counsel as the band's buy-out of any interest Respondent had in the partnership:

> I understand our clients' Offer to Compromise has reached you.
>
> To the extent California Corporations Code § 16701[11] applies to this case, this letter shall serve as the band's offer to pay for your client's interest in the band. The band is ready, willing, and able to pay this amount forthwith, in settlement of all of your client's claims and subject to dismissal of your client's legal action with prejudice.

---

[11] As previously stated by Respondent's counsel, this is the provision governing partnership buyouts under California law.

Letter from David M. Given of Phillips Erlewine & Given LLP to Douglas B. Wroan of The Wroan Law Firm Inc. dated September 15, 2009. (26 TTABVUE 380). Consistent with the partnership buyout requirements under California law, this correspondence was accompanied by the partnership's "balance sheet"[12] with an explanation as to how the proposed buyout from the partnership was calculated.[13] *Id*. Thus, both Petitioner and Respondent implicitly understood that the band consisted of a partnership of which Respondent was no longer a member. It is undisputed that Respondent filed the underlying application solely in his name, with no reference whatsoever to the Wonderbread 5 partnership. As such, the rightful owner of the mark WONDERBREAD 5 for musical performance services did not file the underlying application.

Second, we also consider the legal framework courts and commentators have developed to deal with the special circumstances that tend to arise in ownership disputes regarding a service mark or name to identify a musical performing group in the absence of a written agreement or other legal formalities clearly delineating such rights. One prominent commentator has proposed that "[s]uch problems can only be dealt with adequately by giving weight to customer perception and the

---

[12] Because the partnership had no assets or liabilities, and as such, "no liquidation value," there was no "balance sheet" or "income statement" available from an accounting perspective. Letter from David M. Given of Phillips Erlewine & Given LLP to Douglas B. Wroan of The Wroan Law Firm Inc. dated September 15, 2009 (26 TTABVUE 380).

[13] Gilles' average annual gross income from the partnership was valued at $ 58,902 based on his annual gross income (rounded to the nearest dollar) between the years 2004-2008. Setoffs to this figure were then applied ($ 5000 severance payment and $ 4000 "Transaction Costs to the Band") to arrive at a final buy-out figure. Letter from David M. Given of Phillips Erlewine & Given LLP to Douglas B. Wroan of The Wroan Law Firm Inc. dated September 15, 2009 (26 TTABVUE 381).

identification of source and quality policies of trademark law." 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:45 (4th ed. 2015). Courts frequently refer to such disputes as "a case of joint endeavors." *See, e.g., Crystal Entertainment & Filmworks Inc. v. Jurado,* 99 USPQ2d 1197, 1203 (11th Cir. 2011) (citing *Bell v. Streetwise Records, Ltd.*, 640 F. Supp. 575, 231 USPQ 281 (D. Mass. 1986)). On this topic, the test developed by Professor McCarthy, which has been adopted by several courts, serves as a useful adjunct to our findings concerning the parties' partnership activities, discussed above. *See, e.g., Crystal Entertainment & Filmworks Inc.,* 99 USPQ2d at 1203 (adopting and citing 2 McCarthy, *supra,* § 16:45, pp. 16-85 to -86); *Bell*, 231 USPQ at 286 (adopting McCarthy treatise two-part test); *Cheng v. Thea Dispeker Inc.,* 35 USPQ2d 1493, 1496 (S.D.N.Y. 1995) (adopting McCarthy treatise two-part test).

In factual circumstances similar to those presented here, where there has been a departure and change of membership in the musical performing group, McCarthy frames the critical inquiry as "Does Mark Identify the Group Regardless of its Members?" *Id.* His starting point for the analysis is set forth below:

> In these performing group cases, it must first be determined whether the group name is personal to the individual members or not. If not, a second question then must be determined: for what quality or characteristic is the group known and who controls that quality? The answer should identify the person or entity that owns the group name as a mark.

*Id.* He posits that

> [w]hether the service mark or name identifies and distinguishes that particular performer combination or just style and quality of a group is an issue of fact. This

issue of the "personal" or "impersonal" nature of a group name may be merely a facet of the rule that a substantial change in the nature or quality of goods or services sold under a mark may result in such deception as to break the chain of title or result in abandonment. Temporal continuity of identification is an important function of a mark. The issue to be resolved is whether the mark signifies personalities, or style and quality regardless of personalities.

*Id.*

By way of illustration, in the seminal case of *Bell v. Streetwise Records*, 231 USPQ at 286, the court applied McCarthy's two-part test to resolve an ownership dispute between members of the musical performing group New Edition and Streetwise Records, the record company which produced and marketed the group's first albums. A dispute ensued after New Edition switched labels and Streetwise Records sought to retain the band's name. Streetwise argued that New Edition was a "concept group" – a musical performing group formed primarily by the record company which hires a group of performers to promote their "concept" in order to fulfill "an unfilled 'niche' in the entertainment market." *Id.*, 231 USPQ at 286 n.18.[14] The court, however, rejected this argument, finding that the mark New Edition identified the five band members' "distinctive personalities and style as performers. … They and no one else controlled the quality of those services. They own the mark." *Id.* at 287. As the court explained, "it was personality, not marketing, that led to the public's intimacy with plaintiffs. The 'magic' that sold

---

[14] One example given by the court of a "concept group" was "Menudo," a band where public auditions were held to replace band members forced into retirement when reaching the age of 14. *Id.*

New Edition, and which 'New Edition' has come to signify, is these five young men" as opposed to "replaceable actors in a play … ." *Id.*

Applying McCarthy's test here, a preponderance of the evidence shows that the mark WONDERBREAD 5 was not "personal" to Gilles, or for that matter, any of the band members as individual musicians. Rather, the mark signified the collective "style and quality" of the group, and the partnership, not Respondent, controlled those qualities. That is to say, the mark WONDERBREAD 5 identifies a Jackson 5 tribute band, not a "particular performer combination." Respondent described the "style and quality" of Wonderbread 5 as follows:

> It would be a five-piece band, because it was going to be Jackson 5, so there would be five of us. And we also determined the configuration would be lead singer, guitar, bass, drums and keyboards.
>
> We also agreed and came up with that we would wear over the top '70s outfits. And we would also wear wigs.

Gilles Deposition at 17:6-15 (32 TTABVUE 21). This is consistent with Rickard's characterization of the band as "a bunch of Caucasian boys playing Jackson 5 songs." Rickard Deposition at 8:24-9:7 (31 TTABVUE 10). Thus, by its very nature, the band required the performance of five individual members – no more, no less.

"Over the top" costumes reminiscent of the 1970s were an integral part of the band's public persona. Indeed, Rickard testified that the Band's discontent with Respondent began in part with his refusal to wear the appropriate costume:

> He [Gilles/Respondent] was just – he's, like, "I'm here. I'm doing my job." Basically standing there playing guitar.
>
> It's, like "No, you're an entertainer. You need to put on a show. We're hired to do a certain thing. You're hired to wear these costumes. They

asked us to wear these costumes. I don't care what you think you're asked to wear. You're disrespecting the person who hired you by not doing what they asked."

Rickard Deposition at 42:16-24 (31 TTABVUE 43). *See also* Gilles Deposition at 88:12-20 (32 TTABVUE 91). According to Rickard, the "final straw that broke the camel's back" occurred at a fundraiser where the band members were requested to wear "these colored kind of paisley tuxedos" but Respondent showed up instead in a "white suit that had nothing to do with anything we were wearing." Rickard Deposition at 48:18-49:1 (32 TTABVUE 49). This incident shows that it was the partnership/group who monitored and controlled the "style and quality" of the band, not Respondent. Clients who booked the band for performances clearly expected to see a five member Jackson 5 style tribute band dressed in overstated 1970s style clothing. *See* Rickard Deposition at 42:16-24 (31 TTABVUE 43). Thus, the 1970s era costumes were perceived by consumers as critical to the meaning of and services offered under the WONDERBREAD 5 brand name.

In addition, the music performed was not personalized by the performers in any manner. The band used "back tracks" or "prerecorded music" at "gigs." *Id.* at 51:13-52:13 (31 TTABVUE 52). Respondent made no, or, if any, a minimal, contribution to the prerecorded music (perhaps singing "some background vocals"). *Id.* at 53:10-23. (32 TTABVUE 54). The use of prerecorded music at live performances reinforces the determination that WONDERBREAD 5 did not belong to any particular member but rather the partnership as a group.

Changes in the composition of the performing group is further evidence that the mark WONDERBREAD 5 signified to the consuming public a specific "style and

quality" regardless of individual band member personalities. The record shows that one of the original members of the band departed about a year after its inception, and that a number of substitutes played in the band at various times. *Id.* at 9:14-21; 21:18-22:17 (31 TTABVUE 22-23). For example, Clay Bell, a musician and a non-party witness in this proceeding, testified that he played with the Band as both a "vocal sub" and "guitar sub." Bell Deposition at 6:16-18 (27 TTABVUE 7). Another third-party witness, Fraser Lunney, testified that he played with the band as a bass guitar substitute in approximately 50 shows over a thirteen year time period. Lunney Deposition at 5:20-7:13 (28 TTABVUE 7-8).

Taken as a whole, we find by a preponderance of the evidence that at the time Respondent filed his application, the consuming public did not associate the mark WONDERBREAD 5 with Respondent, but rather with the style of a Jackson 5 tribute band costumed in exaggerated 1970s regalia. The record shows that it was indeed the group/partnership consisting of WONDERBREAD 5 that controlled this quality or characteristic of the band.

Thus, the facts of record are inconsistent with Respondent's claim to have any continuing ownership of the mark WONDERBREAD 5 in his own right. *See Conolty v. Conolty O'Connor NYC LLC,* 111 USPQ2d 1302, 1309 (TTAB 2014) (finding that because applicant and opposer are "partners," applicant is not the sole owner of the mark and therefore the application is void).[15] We therefore find that Petitioner has

---

[15] The *Conolty* case, 111 USPQ2d at 1303, concerned an ownership dispute over the mark FAIRWAY FOX in a trademark application for goods identified as "Golf and tennis clothing, namely, skirts, shorts, skorts, dresses, pants, shoes, hats, shirts, sweaters, vests, socks, visors, t shirts, and jackets." In that case, both parties agreed that *Wrist-Rocket Mfg. Co. v.*

established by a preponderance of the evidence that Respondent was not the owner of the applied-for mark WONDERBREAD 5 for the live musical performance services identified in the involved registration at the time he filed his application on March 12, 2009; that therefore the application was void *ab initio*; and that the resulting registration is invalid.

**Decision***:* The petition for cancellation is granted, and Registration No. 3691948 will be cancelled in due course.

Insofar as we have determined that Petitioner has prevailed on its ownership claim, Petitioner's Section 2(d) and fraud claims are dismissed as moot.

---

*Saunders*, 379 F. Supp. 902, 183 USPQ 17 (D. Neb. 1974), *aff'd in part and rev'd in part*, 516 F.2d 846, 186 USPQ 5 (8th Cir. 1975), set forth the appropriate factors to apply to determine ownership of the mark. *Id*. at 1305. An article entitled "Who owns the mark? A single framework for resolving trademark ownership disputes" by Pamela S. Chestek, 96 TMR 681 (2006), suggests applying a modified version of the *Wrist-Rocket* factors to resolve ownership disputes involving the names of musical performance groups. We conclude that the two-part test formulated by McCarthy and specifically adopted by other courts as noted above is more appropriate here, although the *Wrist-Rocket* factors may apply in other types of ownership disputes.